

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1373-09

### RONNIE DUANE MASON, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### POTTER COUNTY

MEYERS, J., delivered the opinion of the Court in which PRICE, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. WOMACK, J., filed a concurring opinion. KELLER, P.J., concurred. JOHNSON, J., dissented.

### O P I N I O N

Appellant, Ronnie Duane Mason, was convicted of capital murder and sentenced to life imprisonment. At a pretrial hearing, defense counsel requested the grand jury testimony of Anthony Richards, Appellant's cousin. Upon receiving the testimony more than a year later, defense counsel saw that unauthorized persons had questioned Richards during the grand jury proceedings. Appellant filed a motion to quash the indictment,

which the judge overruled. The court of appeals reversed the trial court's judgment after concluding that the State's unauthorized questioning caused harmful error. We granted review to determine the proper harm analysis for reviewing the overruling of Appellant's motion to quash. We will reverse.

## I. Facts

On the morning of June 28, 2004, officers responded to a call that a baby was not breathing. The child, eight-month-old Iveyonna Durley, had been left with Appellant and Richards when her mother went to work that day. Upon arriving at the apartment, the officers found Iveyonna without a pulse. Richards explained to the officers that he checked on the baby after hearing her scream and found that she had rolled off the bed and had hit her head. He said that he then called Appellant, who arrived at the apartment with Kresha Ryan.[1] Richards repeated this story in subsequent statements, but eventually identified Appellant as the child's killer.

Richards said that Appellant hit Iveyonna with his fist two or three times while she was on the living room couch. At that point, Richards took the baby from the couch to her mother's bed. In the bedroom, Appellant kicked Iveyonna and struck her with a mop or broom. Then, Appellant left the apartment to pick up Kresha, and Richards brought the baby back to the couch in the living room. Before Appellant left, he and Richards discussed that, if authorities questioned the state of the child, they would report that she

---

[1]Richards falsely identified himself and Appellant to the responding officers.

fell off the bed. When Appellant and Kresha returned to the apartment five minutes later, Iveyonna was cold and not breathing. Kresha called 911. The autopsy determined the cause of death to be multiple blunt force injuries.[2]

## II. Procedural history

At a hearing over a year before the trial began, Appellant's counsel requested a copy of the grand jury testimony to learn which of Richards's various explanations he had presented to the grand jury.[3] Defense counsel finally received the testimony just prior to the commencement of voir dire. The videotape of Richards's testimony revealed that Sergeants Crandell and Dockery asked several questions of the witness. Both officers had been dispatched on the morning of Iveyonna's death. Sergeant Crandell was one of the officers to arrive at the apartment that morning, while Sergeant Dockery was sent to the hospital to interview family members. Upon learning of the officers' grand jury participation, defense counsel filed a motion to quash the indictment, asserting that the State had violated Articles 20.011 and 20.04 of the Code of Criminal Procedure. CODE CRIM. PROC. ANN. arts. 20.011 and 20.04. The trial court overruled Appellant's motion, but acknowledged that "the statute is crystal clear" and that it had been violated during

---

[2]As a result of Iveyonna's death, Richards was charged with injury to a child by omission.

[3]The date of this hearing was July 6, 2006, but several requests were made for the grand jury testimony over the course of approximately two years. In June of 2005, defense counsel filed a motion for discovery of grand jury transcripts. Then, on August 10, 2007, defense counsel filed a motion for disclosure and preservation of grand jury materials, followed by the motion to quash the indictment on August 17.

the grand jury proceedings. The jury found Appellant guilty of capital murder, and the court sentenced Appellant to life in prison.[4]

## III. Code of Criminal Procedure Articles 20.011 and 20.04

Article 20.011 lists those who may be present in a grand jury room while the grand jury is conducting proceedings:

(1) grand jurors;
(2) bailiffs;
(3) the attorney representing the [S]tate;
(4) witnesses while being examined or when necessary to assist the attorney representing the [S]tate in examining other witnesses or presenting evidence to the grand jury;
(5) interpreters, if necessary; and
(6) a stenographer or person operating an electronic recording device, as provided by Article 20.012.

CODE CRIM. PROC. ANN. art. 20.011. The State concedes that it may have violated Article 20.011. Determining whether the State in fact violated this statute hinges on whether the presence of the officers falls under subsection (4); that is, do they qualify as "witnesses . . . necessary to assist the attorney . . . in examining other witnesses"? CODE CRIM. PROC. ANN. art. 20.011.[5] But a determination on this point is not necessary as we know with

---

[4]The State waived the death penalty, so the court automatically imposed a life sentence.

[5]Statutory ambiguity makes this a difficult question to answer. We do not know whether "witnesses" refers only to witnesses who appear before the grand jury, or whether the term also includes witnesses who appear later, at trial. The distinction is critical because while we know that Sergeants Crandell and Dockery were witnesses at trial, we do not know whether they were also witnesses during grand jury proceedings. It seems unlikely that Article 20.011 would refer to trial witnesses as the witnesses permitted to assist the State's attorney during grand jury proceedings. Such an interpretation would mean that a person's role as a witness at trial could retroactively render his grand jury presence "authorized." In this case, the officers were

certainty that the officers' questioning violated another statute, Article 20.04.

Article 20.04 strictly defines those who may question a witness before the grand jury:

> The attorney representing the State may examine the witnesses before the grand jury and shall advise as to the proper mode of interrogating them. No person other than the attorney representing the State or a grand juror may question a witness before the grand jury. No person may address the grand jury about a matter before the grand jury other than the attorney representing the State, a witness, or the accused or suspected person or the attorney for the accused or suspected person if approved by the State's attorney.

CODE CRIM. PROC. ANN. art. 20.04. The State concedes that it did violate Article 20.04.

## IV. Court of appeals

On appeal, Appellant argued that the violations of Articles 20.011 and 20.04 were not harmless. The court of appeals agreed. *Mason v. State*, 290 S.W.3d 498 (Tex. App.–Amarillo 2009, pet. granted). The court conducted a harm analysis to "determine whether the violations of articles 20.011 and 20.04" affected the grand jury's decision to indict Appellant.[6] *Id.* at 506. Because there was "evidence that the State's violations

---

witnesses at trial more than two years after the grand jury proceedings; so to say that the role they served at trial in August of 2007 authorized their presence in front of the grand jury in January of 2005 seems absurd. If "witnesses" in this context refers exclusively to witnesses testifying before the grand jury, and if the officers were witnesses only at trial, then the State violated Article 20.011.

[6]The court of appeals conducted its analysis on the premise that the State had conceded violating both statutes. However, in its briefs to both the court of appeals and this Court, the State admitted to violating only Article 20.04. The State's concessions regarding Article 20.011 are more vague. While the State may have violated Article 20.011, we cannot be certain. Therefore, we will refer to the State's "violation," though the court of appeals believed there had

likely exerted a substantial influence on the [g]rand [j]ury's decision," and because the court could not say that the decision to indict was free from the substantial influence of the violations, the court of appeals determined that the trial court abused its discretion in denying Appellant's motion. *Id.* at 509-10.

In its Petition for Discretionary Review to this Court, the State argued that the court of appeals misdirected the focus of its harm analysis by considering how the error affected the charging decision instead of how it affected the verdict. The State also asserted that the court of appeals improperly assumed a supervisory role.[7] We will determine whether the court of appeals properly evaluated the effects of the State's error.

## V. Rule of Appellate Procedure 44.2

Rule of Appellate Procedure 44.2 addresses the treatment of reversible error in criminal cases.

> (a) *Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

---

been two statutory violations.

[7]This Court granted review on the following two grounds:
(1) The court of appeals employed an incorrect harm analysis in reviewing the State's error in allowing unauthorized persons to question a witness before the grand jury; the focus should have been on whether the error affected Appellant's substantial rights, rather than whether it contributed to the grand jury's charging decision.
(2) In reversing a conviction for the avowed purpose of deterring the State's future violation of grand jury procedural statutes, notwithstanding the harmlessness of the violation involved, the court of appeals improperly assumed a supervisory role.

(b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

TEX. R. APP. P. 44.2. A statutory violation at the grand jury stage is not constitutional error, and therefore Rule 44.2(b) applies in this case. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-55 (1988); *United States v. Mechanik*, 475 U.S. 66, 71 (1986) (When evaluating prosecutorial misconduct involving the presence of two law enforcement agents at a grand jury proceeding, the Court applied the federal equivalent of Rule 44.2(b), Federal Rule of Criminal Procedure 52(a). That rule states, "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.")

Under Rule 44.2(b), a substantial right is affected when the error has a substantial and injurious effect or influence. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). The issue presented in this case is what should be examined for evidence of an effect or influence? Should the subject of our harm analysis be the grand jury's decision to indict or the petit jury's guilty verdict? The court of appeals chose to direct its attention to the product of the grand jury proceedings, while the State asserts that the harm analysis should focus solely upon the verdict.

## VI. *United States v. Mechanik*

A similar issue was before the Supreme Court in *Mechanik*. *Mechanik*, 475 U.S. at 67. That case involved a violation of Federal Rule of Criminal Procedure 6(d), which limits those who may be present at a grand jury proceeding. FED. R. CRIM. P. 6(d). The

rule allows the presence of "the witness," and so the fact that two law enforcement agents were "sworn together and questioned in tandem" gave the defendants grounds to move for dismissal of the indictment. *Mechanik*, 475 U.S. at 67-68.

In the majority opinion, written by Justice Rehnquist, the verdict resolved the issue:

> We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the rule violation.

*Id.* at 67. Missing from the majority opinion is a detailed harm analysis. Instead of inspecting for effects of the rule violation, the Court held that "the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation."[8] *Id.* at 73.

In her concurring opinion, Justice O'Connor directed attention to the charging decision, instead of the verdict, stating:

> A Rule 6(d) violation is one affecting the grand jury proceeding and is not in any sense a trial error. Accordingly, the logical focus of the harmless error inquiry is an examination of the influence of the error on the charging decision.

*Mechanik*, 475 U.S. at 76 (O'Connor, J., concurring) (italics omitted). In addition to

---

[8]The majority hints that the analysis would be different "had the matter been called to [the district court's] attention before the commencement of the trial." *Mechanik*, 475 U.S. at 69-70. As it was, the defendants in that case did not acquire the grand jury transcript revealing the unauthorized presence of two law enforcement agents "until the second week of trial." *Id.* at 70. In Appellant's case, the trial court did receive notice of the problem before the trial commenced.

advocating a different focus, Justice O'Connor also presented a different analytical

approach. In contrast to the majority's decision, which she characterized as "a *per se* rule

based on the ultimate verdict at trial," Justice O'Connor completed a harm analysis asking

if "the violation substantially influenced the grand jury's decision to indict, or if there

[wa]s grave doubt as to whether it had such effect." *Id.* at 77-78. After reviewing the

details of the violation and considering how the proceedings might have ended differently

had the violation not occurred, Justice O'Connor concluded, as did the majority, that the

convictions should not have been set aside. *Id.* at 79.

Later, in *Bank of Nova Scotia*, the Supreme Court adopted "the standard articulated

by Justice O'Connor in her concurring opinion in *United States v. Mechanik*" as "the

standard of prejudice that courts should apply" when "a court is asked to dismiss an

indictment prior to the conclusion of the trial" for nonconstitutional error. *Bank of Nova*

*Scotia*, 487 U.S. at 256. *Bank of Nova Scotia* endorsed Justice O'Connor's focus on the

charging decision as well as her completion of a harm analysis.

> The prejudicial inquiry must focus on whether any violations had an effect
> on the grand jury's decision to indict. If violations did substantially
> influence this decision, or if there is grave doubt that the decision to indict
> was free from such substantial influence, the violations cannot be deemed
> harmless.

*Id.* at 263.

## VII. Analysis

Based upon this precedent, we agree with the court of appeals that when

addressing a grand jury statutory violation, the proper subject of a harm analysis is the product of those proceedings: the charging decision. We will consider whether Appellant's substantial rights were affected by the violation and whether the unauthorized questioning had a substantial and injurious effect or influence on the grand jury's decision to indict. TEX. R. APP. P. 44.2(b). If the record does not show that the violation influenced the grand jury, or if we detect just a "slight effect," then the trial court was correct to deny Appellant's motion to quash. *See Taylor*, 268 S.W.3d at 592. In this analysis, we will examine the record as a whole. *Vannortrick v. State*, 227 S.W.3d 706, 709 (Tex. Crim. App. 2007).

During Anthony Richards's grand jury testimony, the State's attorney, J. Patrick Murphy, conducted most of the questioning. Murphy's questions covered the details of Appellant's physical assault on Iveyonna. The questions posed by Sergeants Dockery and Crandell addressed further details of the assault ("At any time did you see any blood on the baby?"), Richards's conflicting statements ("So everything you told me, pretty much, is a lie?"), his actions on the day of Iveyonna's death ("You did change her diaper?"), and his inaction during the events which led to her death ("Do you feel like you should have done more to help that baby?"). Sergeant Dockery closed his participation by stating: "All I can say is I do appreciate the fact you did come and talk to us, and I appreciate the fact you stepped forward and talked to us. Hopefully you are telling us the truth. And all I can say is good luck to you."

After reviewing the grand jury transcript, we do not detect a substantial and injurious effect on the grand jury's decision to indict Appellant. The details regarding Appellant's conduct on the date of Iveyonna's death were well established by Murphy's (authorized) questioning, and members of the grand jury could indict Appellant without the additional information solicited by Sergeants Dockery and Crandell. The unauthorized questioning served to paint a picture of Richards's role, not Appellant's.[9] Therefore, we cannot say that "the violation substantially influenced the grand jury's decision to indict" Appellant, nor is there "grave doubt as to whether it had such effect."[10] *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring).

---

[9] If we were evaluating Richards's testimony as a whole, then we would most certainly detect influence upon the jurors; but, importantly, we are exclusively concerned with the information solicited by the officers.

[10] The court of appeals relied upon the *Harris* factors in reaching its conclusion that the State's violations influenced the grand jury's decision. *Harris v. State*, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989). The factors include the source of the error and to what extent it was emphasized by the State. *Id.* The analysis in *Harris* was governed by the antecedent to Rule of Appellate Procedure 44.2(a) "Constitutional Error," former Rule of Appellate Procedure 81(b)(2); and therefore, we do not believe these factors to be helpful in Rule 44.2(b) analyses. In particular, the factor of "whether declaring the error harmless would encourage the State to repeat it with impunity," is misplaced when addressing nonconstitutional error under Rule 44.2(b). *Id.* We acknowledge that the court of appeals is not alone in believing *Harris* to be useful in 44.2(b) harm analyses. *See Smith v. State*, 36 S.W.3d 134 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). And, at times, this Court has invoked select factors from *Harris* in our 44.2(b) harm analyses. *See Motilla v. State*, 78 S.W.3d 352, 356-57 (Tex. Crim. App. 2002) (endorsing the State's emphasis of the error as a factor and stating that "our conclusion in *Harris*, that overwhelming evidence of guilt is a factor to be considered" applies in Rule 44.2(b) analyses"); *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997) (that the State did not emphasize the error supported our conclusion that the appellant's substantial rights were not affected under Rule 44.2(b)). Though the *Harris* factors might still be applicable in Rule 44.2(a) analyses, they are unnecessarily limiting when we are to consider the record as a whole. *Vannortrick*, 227 S.W.3d at 709.

The State's second issue to this Court asserts that the court of appeals improperly assumed a supervisory role: "To reverse for purposes of ensuring the State's more careful future attention to the procedural statutes is to assume an improper supervisory function." If the court of appeals had reversed the trial court's judgment solely for this reason, the State's argument would be correct. Courts may not invoke supervisory power to prescribe "standards of prosecutorial conduct," to circumvent a harm analysis, or to reverse a conviction after a harm analysis determines an error to be harmless. *United States v. Williams*, 504 U.S. 36, 46-47 (1992); *Bank of Nova Scotia*, 487 U.S. at 254-55. But the State's argument ignores the court of appeals's completion of a harm analysis and its detection of the violation's effects upon the grand jury. The court was not simply acting to direct future conduct. To the contrary, the court concluded that Appellant was prejudiced by the State's actions and then proceeded, with authority, to reverse the trial court. Though we disagree with the results of the court of appeals's analysis, we will not say that the court of appeals exceeded its authority.

## VIII. Conclusion

We agree with the analytical focus chosen by the court of appeals, but we do not agree with its conclusion that the State's actions caused harmful error. Because the error here was not harmful, we reverse the court of appeals.

Meyers, J.

Delivered: October 6, 2010
Publish